**Garry Vincent FEATHERSTONE,
Petitioner–Appellant,**

v.

**Wayne E. ESTELLE, Warden,
Respondent–Appellee.**

No. 89–55090.

United States Court of Appeals,
Ninth Circuit.

Submitted Oct. 30, 1989.*

Submission Deferred July 16, 1990.

Resubmitted Oct. 24, 1991.

Decided Oct. 31, 1991.

---

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

William K. Rasmussen, Arcadia, Cal., for petitioner-appellant.

Donald F. Roeschke, Deputy Atty. Gen., Los Angeles, Cal., for respondent-appellee.

Before NORRIS, REINHARDT and TROTT, Circuit Judges.

TROTT, Circuit Judge:

Petitioner was convicted by a jury in a California court of rape, burglary, robbery, and attempted robbery. His application for a writ of habeas corpus was denied, and he appeals the denial pro se. He claims the state trial court committed prejudicial errors that deprived him of due process by: (1) admitting evidence of an uncharged, nine-year-old prior rape of another woman to prove identity with respect to current counts involving victim Gay Austin; (2) joining counts involving victims Austin and Christine Emmons when the evidence of the uncharged prior incident of rape was relevant only to the Austin counts; (3) failing to instruct the jury to consider the evidence of the uncharged prior rape only with respect to the Austin counts; (4) admitting photo-lineup identification evidence based on full-face photos where the assailant wore a mask, and then destroying the

photograph of petitioner used in that line-up; and (5) disregarding the prosecution's use during closing argument of a statistic not presented to the jury as evidence. Also, petitioner contends he did not receive effective assistance from either trial or appellate counsel in violation of the Sixth Amendment. The district court denied habeas relief. We affirm.

## I

Petitioner, Garry Featherstone, was convicted by a jury in California Superior Court of rape, burglary, robbery, and attempted robbery. The trial joined incidents and counts arising from separate events involving two victims, Gay Austin and Christine Emmons.

### The Austin Crimes

On the evening of March 28, 1981, a man knocked on the door of Austin's Venice home. He first claimed he was looking for the owner of a black Chrysler, and then asked if she knew of any apartments to rent. He left after she told him through a window that she did not know of any available. Later that evening, while she was on her way from her apartment to her car, the same man approached her. He carried a gun in his left hand. He forced her to return to her home, blindfolded her, demanded drugs, money, and jewelry, took money, ordered her to lie down on the bed, ordered her to "put it in," and kissed and raped her. Petitioner was charged with rape, robbery, and burglary. Ms. Austin died of natural causes after petitioner's preliminary hearing, and her testimony was introduced at his trial by way of the preliminary hearing transcript. Petitioner was convicted as charged.

### The Emmons Crimes

On January 5, 1982, a man carrying a knife in his left hand awakened Emmons in her Venice home, threatened to kill her if she screamed, covered her head with a towel or blanket, demanded (and apparently took) money, ordered her to lie on the couch, opened her robe and pushed aside her undergarments, and left.

On January 21, 1982, a man knocked at Emmons' door claiming that a van was in his parking space and asking for the building manager's name. When she slightly opened the door, a man wearing a ski mask with cut-out eye holes and carrying a revolver kicked in the door. He threatened to kill her if she screamed, ordered her to lie on the floor, and demanded drugs, money, and jewelry. When a passing car's headlights shone through a window, he left. Apparently, Emmons never got a look at her assailant's full face; she saw only his eyes.

Petitioner was charged with robbery in connection with the January 5 episode and attempted robbery and burglary in connection with the January 21 episode. He was convicted as charged with respect to the January 21 crimes, but he was acquitted of all charges with respect to January 5.

## II

The critical issue in petitioner's trial was whether he was Austin's and Emmons' assailant.

Austin could not positively identify anyone as her assailant from photographs shown to her by the police soon after the attack, but later she positively identified petitioner in a live lineup. She emphasized the way he moved, his voice, his hands, and his neck. She also identified him at the preliminary hearing held before she died of natural causes.

Before trial, Emmons identified petitioner's eyes from a lineup of full-face photographs. A police officer testified that she made the photo identification with "extreme caution." Although correct police procedure was to preserve a photograph that results in an identification, a police officer destroyed the photograph of Featherstone used in the photo lineup because he believed that the district attorney would not introduce a photo-lineup identification of a suspect's eyes at trial. (Petitioner concedes that the police did not destroy the photograph "maliciously.")

Immediately after the photo lineup, Emmons identified petitioner's physique and

voice at a live lineup of masked men. She also identified his voice from a tape, identified him at the preliminary hearing, and identified a jacket and pair of pants as the type and color he wore.

At trial, Emmons identified petitioner, as well as the mask he was wearing, but tentatively selected a photograph of another's eyes (apparently a photograph of petitioner's brother) from a photo lineup conducted by defense counsel. Defense counsel presented to the jury the infirmities of the original photo lineup—i.e., that it showed Featherstone's whole face even though Emmons had seen only the perpetrator's eyes. The court instructed the jury that it could draw an adverse inference from the loss of the photograph used in the photo lineup.

To prove identity through a common modus operandi with respect to the Austin counts,[1] the trial court admitted the testimony of Sharon Rollins about an uncharged prior rape. It is this testimony that forms the core of petitioner's main challenge to his conviction.

### The Rollins Crimes

On the morning of October 31, 1974, Sharon Rollins saw a man knocking at the landlord's door at her Venice duplex. The man asked her if the landlord was in. Later, a man knocked at her door and identified himself through the closed door as the new landlord. When Rollins slightly opened the door, a man she later positively identified as petitioner, wearing makeup and a nylon stocking over his head and carrying a knife, forced his way into her apartment. He threw a blanket over her, threatened to kill her if she screamed, and conversed with her regarding his wish to kill her. Then he took the nylon stocking off his head, washed off his makeup, tried to kiss her, ordered her to lie on the bed, ordered her to "put it in," raped her, and stole money. During this episode, Rollins observed petitioner's face for approximately twenty minutes. Rollins later identified him from two photographs shown to her by

police with hundreds of others in mugbooks. Subsequently, she identified petitioner at a police station and in a court hearing. She repeated her positive identification of him at his trial for the crimes involving victims Austin and Emmons. Petitioner had been incarcerated during the nine years between the Rollins and Austin incidents. He was never charged with any crime relating to the Rollins incident.

### III

A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis of some transgression of federal law binding on the state courts. It is unavailable for alleged error in the interpretation or application of state law. Thus, it is not available when a petitioner merely alleges that something in the state proceedings was contrary to general notions of fairness or violated some federal procedural right unless the Constitution or other federal law specifically protects against the alleged unfairness or guarantees the procedural right in state courts.

*Middletown v. Cupp*, 768 F.2d 1083, 1085 (9th Cir.1985) (citations omitted), *cert. denied*, 478 U.S. 1021, 106 S.Ct. 3336, 92 L.Ed.2d 741 (1986). As the Supreme Court observed last term:

> [i]n the habeas context, the application of the independent and adequate state ground doctrine is grounded in concerns of comity and federalism. Without the rule, a federal district court would be able to do in habeas what this Court could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws.

*Coleman v. Thompson*, —— U.S. ——, 111 S.Ct. 2546, 2554, 115 L.Ed.2d 640 (1991). Thus, "a claim for deprivation of due process will succeed only if the trial court's errors rendered the trial arbitrary or un-

---

1. Under California law, evidence of an uncharged prior crime is admissible to prove iden-

tity through a distinctive modus operandi. Cal. Evid.Code § 1101 (West Supp.1991).

fair." *McGuire v. Estelle,* 902 F.2d 749, 753 (9th Cir.1990) (citation omitted), *cert. granted,* — U.S. —, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991). *See also Pennywell v. Rushen,* 705 F.2d 355, 357 (9th Cir.1983); *Cassasa v. Nelson,* 452 F.2d 1083, 1085 (9th Cir.1971); *Crisafi v. Oliver,* 396 F.2d 293, 294–95 (9th Cir.1968), *cert. denied,* 393 U.S. 889, 89 S.Ct. 208, 21 L.Ed.2d 167 (1968); *Chavez v. Dickson,* 280 F.2d 727, 736 (9th Cir.1960), *cert. denied,* 364 U.S. 934, 81 S.Ct. 379, 5 L.Ed.2d 366 (1961).

## IV

To reach the first due-process issue generated by the Rollins testimony, we must be persuaded preliminarily that the state trial court erred in admitting her testimony. We find no such error. It is apparent from the record that the trial court held a full pretrial hearing on August 1, 1983, to consider the proffered testimony, and that the appropriate considerations on both sides of the balance were carefully weighed. To indicate the level of consideration given to this issue by the Court of Appeal of California, we quote from its unpublished opinion, *People v. Featherstone,* No. B006206 (Cal.Ct.App. Jan. 21, 1986).

Here, the trial court listed a number of "significant signatures of the crime which may lead a jury to conclude that because of the similarities," the person who committed the uncharged Rollins rape and robbery likewise committed the charged Austin rape and robbery. The court identified these "significant signatures" of the uncharged and charged rapes and robberies to include, in addition to the taking of money, the following:

"... the essential ingredients of the subtrafuge [sic] the close proximity of the defendant's house to the victim's, the ages of the respective parties, the use of a deadly weapon, the blindfolding attempts to conceal identity, the forcing each of the victims to first lie on their stomach before subjecting the victim to the sexual assault, to requiring them and telling them to remove their clothes rather than removing them or stripping them of their clothes, kissing both of them, I think, and I agree that additionally telling one to wrap the legs around, the other one to move, requiring greater response than simply a passive submission to the sexual assault, the statement 'put it in' to each of them, regardless of the victim's response...."

Of these the court denominated the following as "unique signatures": (1) engaging in a ruse to gain access to the victims; (2) using physical means—a blindfold, blanket over the head, towel over the victim's head—to obstruct the victim's view of him; (3) forcing the victims to lie on their stomachs on a bed or bed substitute and then to turn over before being told to undress themselves; and (4) saying the same words, "put it in," to the victims.

The court found that the remaining "significant signatures," though more typical of forcible rape cases, "when taken into the aggregate [with the 'unique signatures'], seem to establish a common plan and scheme that the relevance is that the person who committed the ... [Rollins] rape is also the person who committed the Austin rape" under the tests set forth in *People v. Haston* (1968) 69 Cal.2d 233 [70 Cal.Rptr. 419, 444 P.2d 91] and *People v. Thompson* (1980) 27 Cal.3d 303 [165 Cal.Rptr. 289, 611 P.2d 883].

Appellant correctly notes several dissimilarities between the uncharged (Rollins) and charged (Austin) offenses. In Rollins, a disguise was worn; in Austin, no disguise was worn. In Rollins, a knife was brandished; in Austin, a gun was brandished. In Rollins, the victim was attacked outside the house and dragged inside; in Austin, the victim was attacked inside the home. The Rollins incident occurred in daylight; the Austin incident at night. The Rollins rapist removed his disguise and spoke at length with the victim; the Austin rapist blindfolded his victim and said little.

However, the record amply demonstrates the trial court's serious consideration of these dissimilarities in exercising its discretion during the hearing on the

motions to suppress evidence brought under Evidence Code sections 402, 403, 405, and 1101, subdivision (b). In weighing the dissimilarities against the similarities between the offenses in view of the relevant case authority, the trial court correctly observed that it was not necessary that a defendant such as appellant be "an automaton ... that is, to precisely replicate each and every act, each and every statement that has occurred in other offenses but rather, when you look at the totality of the circumstances, there seems to be the inescapable inference that because of the similarities, the strong similarities, the unique similarities, that the same person committed both offenses." The court expressed a similar view during the trial in allowing testimony as to the prior Rollins offense.

In reaching its conclusion based on consideration of all relevant similarities and dissimilarities between the offenses, under the totality of the circumstances and using the proper legal standards, the trial court did not abuse its discretion in allowing into evidence the uncharged prior offenses for the purpose of establishing a common scheme or plan and the identity of the assailant in the Austin counts.

Appellant's argument that the Rollins incident was too remote in time from the charged offenses likewise lacks merit. . . . .

[T]he case at bench involves numerous similarities between the uncharged and charged offenses, including a number of "unique signatures," that suggest appellant's "modus operandi or distinctive, characteristic method of committing crimes." One would not necessarily expect such "unique signatures" to disappear or change significantly over time as might a particular common plan or scheme. That is especially true in the case before us in light of respondent's argument that, for a great portion of the intervening nine-year time period between the uncharged and charged offenses, the appellant had been imprisoned and thus deprived of opportunities to demonstrate repeatedly those "unique signatures." The reappearance of those "unique signatures" after appellant's release from prison actually tends to validate their interpretation as part of his modus operandi or his distinctive, characteristic method of committing crimes. Thus, in the particular facts of this case, the trial court did not abuse its discretion in finding that the prior offenses were not too remote.

While we do not necessarily adopt all of the state court's reasoning, we agree generally with its analysis. Because we find no error in the admission of this evidence, we reject petitioner's claim that it deprived him of due process of law.

## V

■ Although the Rollins testimony was relevant to the Austin counts, it was irrelevant and potentially harmful in the Emmons counts. The trial court was required under California law to give a limiting instruction. It failed to do so, and the state court of appeal concluded that this lapse constituted error. Petitioner claims that this error deprived him of due process of law. The full record demonstrates, however, that the effect of this error on petitioner's trial was patently inconsequential. First, the trial court did give an adequate limiting instruction (CALJIC No. 2.50 (1979 Rev.)) confining the evidence to the issue of identity based on a characteristic method. Second, as observed by the California Court of Appeal in its opinion:

(1) [a]lthough the prior uncharged offenses included robbery and rape, rape was not charged with respect to Emmons, and appellant was acquitted of the January 5 Emmons robbery count which had a sexual overtone and convicted only of the January 21 attempted robbery and burglary counts; (2) If the jury had in fact misused the Rollins incident, appellant would have been convicted of the January 5 crime(s) where the assailant opened Emmons' robe and pushed aside her underwear; but neither of the Emmons counts of which appellant was convicted involved sex-related conduct, which was the basis for most of the

"significant signatures" linking the Rollins and Austin incidents, making highly improbable the jury's use of the prior uncharged offenses evidence in reaching a guilty verdict on the Emmons counts of attempted robbery and burglary; and (3) Emmons' identification of appellant based on his appearance and voice at a live lineup was independent of the prior uncharged offenses evidence.

After reviewing the entire record, we conclude that the error did not cause a miscarriage of justice, and that it is not reasonably probable that a different result would have obtained in the absence of the error.

Third, petitioner's counsel as a tactical matter did not want the trial court to mention the Austin counts in the instructions; and fourth, the deputy district attorney in closing argument urged the jury to consider the Rollins incident only in relation to the Austin charges.

Our own review of the relevant record convinces us beyond a reasonable doubt that the omission of the instruction did not contribute to the Emmons verdict and was harmless. *See Hart v. Stagner*, 935 F.2d 1007 (9th Cir.1991). Thus, it is clear that the failure of the trial court explicitly to restrict the Rollins testimony to the Austin counts did not render petitioner's trial on the Emmons count on which he was convicted arbitrary and fundamentally unfair.

### VI

■ Next, petitioner contends the trial court erred in refusing to sever the Austin and Emmons counts, arguing that their consolidation in a single trial was improper. He claims that introduction of the Rollins evidence as to the Austin counts prejudiced the jury's consideration of the Emmons counts and thus denied him a fundamentally fair trial. Respondent replies that the trial court properly consolidated the counts, and that no prejudice resulted because, as shown by its failure to convict petitioner of the Emmons count involving a sexual over-

tone, the jury clearly compartmentalized the evidence concerning each count.

California Penal Code Section 954 (West 1991) authorizes joinder of offenses of the same class. It reads in relevant part as follows:

[a]n accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses ...; provided that a court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately....

The Fifth Circuit correctly stated in general terms the test we apply in evaluating petitioner's claim of Constitutionally impermissible joinder:

[t]he propriety of a consolidation rests within the sound discretion of the state trial judge. The simultaneous trial of more than one offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate.

*Tribbitt v. Wainwright*, 540 F.2d 840, 841 (5th Cir.1976), *cert. denied*, 430 U.S. 910, 97 S.Ct. 1184, 51 L.Ed.2d 587 (1977). More specifically, we must consider on a count by count basis whether the trial on a particular count was fundamentally unfair in light of that count's joinder with one or more other charges. Here, the issue is whether joining the Austin counts with the Emmons counts on which Featherstone was convicted prejudiced his trial on the latter counts.

For the same reasons we concluded in Parts III and IV that there was no fatal error either in admitting the Rollins testimony or in failing to restrict its admission to the Austin counts, we conclude that the consolidation of the Austin and Emmons incidents did not render his trial on the Emmons counts on which he was convicted fundamentally unfair.[2] To reiterate, it is

---

**2.** To the extent that Featherstone may be argu-

ing a reverse taint—that joining the various

apparent from the jury's discerning verdict that it followed the court's instructions to regard each count as separate and distinct.

## VII

Petitioner also objects to the photo lineup used to identify him. He contends: (1) the State violated due process by destroying the photo of him used in the lineup shown to Emmons; and (2) the trial court violated due process by admitting all lineup evidence after the photo was destroyed. With respect to his second contention, petitioner apparently claims that because the perpetrator wore a mask that obscured most of his face, Emmons' identification of his eyes from a full-face photo shown to her during the initial photo lineup unfairly predisposed her to identify him at his preliminary hearing and trial.

Respondent contends the court properly admitted all lineup identification evidence, and any error was not prejudicial for three reasons. First, the prosecutor had no duty to preserve the photo because it was not exculpatory and was reproducible in comparable form. Second, Emmons exercised "extreme caution" in identifying petitioner's eyes during the photo lineup. Third, Emmons also identified petitioner's voice and physique, identified him both at the preliminary hearing and the trial, and identified his jacket and pair of pants as the type and color worn during the attack.

■ Due process requires that criminal prosecutions "comport with prevailing notions of fundamental fairness." *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984). The State must afford criminal defendants "a meaningful opportunity to present a complete defense," *id.,* which in turn requires that the State must provide an accused with exculpatory evidence. In *Trombetta,* the Supreme Court held on habeas review that California's failure to preserve breath samples yielding breath analysis test results introduced at drunken driving trials did not violate due process. The Court reasoned as follows. First, Califor-

nia authorities did not destroy breath samples in a calculated effort to circumvent disclosure requirements, but instead acted in good faith and per their normal practice. *Id.* at 488, 104 S.Ct. at 2533. Second, and more importantly, the State has a federal Constitutional duty to preserve only evidence "that might be expected to play a significant role in the suspect's defense," *id.* at 488, 104 S.Ct. at 2534 (footnote omitted), i.e., evidence that

> both possess[es] an exculpatory value that was apparent before the evidence was destroyed, and ... [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* at 489, 104 S.Ct. at 2534. The Court asserted that drunken driving defendants could impeach Intoxilyzer results by means other than retesting breath samples. Moreover, the Court subsequently held in *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

With respect to the Constitutionality of the admission by a state court of lineup evidence, the Supreme Court has stated:

> [j]udged by the "totality of the circumstances," the conduct of identification procedures may be "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to be a denial of due process of law.

*Foster v. California,* 394 U.S. 440, 442, 89 S.Ct. 1127, 1128, 22 L.Ed.2d 402 (1969) (quoting *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967)). In *Foster,* the witness was unable to identify petitioner from the first lineup, which involved petitioner, a tall man who wore a jacket similar to that of the perpetrator, plus two short men, or during a one-on-one confrontation. One week later, the witness identified petitioner from a lineup of five men of whom only petitioner had stood in the first lineup. The only other

charges rendered trial on the Austin counts un-

fair—there is simply no basis for such a claim.

evidence against petitioner was the testimony of an alleged accomplice. In holding that the lineup procedure was unconstitutional, the court wrote that "[t]he suggestive elements in this identification procedure made it all but inevitable" that the witness would identify petitioner and therefore "so undermined the reliability of the eyewitness identification as to violate due process." *Id.* 394 U.S. at 443, 89 S.Ct. at 1129.

█ In the case at bar, we conclude that the State did not violate due process either by using a full-face photo lineup where the assailant wore a mask, or by destroying the photo before the trial. The full-face photo lineup was not so inherently suggestive that it undermined the reliability of subsequent identifications and thereby violated due process. Moreover, it is unlikely that Emmons' exposure to the full-face photo influenced her later positive identification of petitioner's physique, voice, and clothes. It conceivably could have predisposed her to identify petitioner at trial, but defense counsel impeached the lineup evidence with his own photo lineup from which Emmons selected the defendant's brother.

As to the destruction of the photo used in the lineup, it is clear that it was not deliberately done to deprive petitioner of access to relevant evidence. The police officer who destroyed the photo did not preserve the photo because he mistakenly believed it was not useful identification evidence. More importantly, the photo lacked any apparent exculpatory value before its destruction, and the defense not only could, but indeed did obtain comparable evidence. That is, as previously noted, the defense on cross-examination impeached the results of the photo lineup and thereby the in-court identification through an effective in-court photo lineup. Furthermore, the court properly instructed the jury that it could draw adverse inferences from the destruction of the photo.[3]

## VIII

During trial, an expert witness for the prosecution testified that Featherstone's hair matched thirteen hairs found in a ski mask identified as having been worn by the perpetrator of the January 21 incident involving Emmons. The witness also testified that a one in 4500 chance existed that a single hair matching the hair of one person also matched that of another. During closing argument the prosecutor stated that a statistician had calculated for her that ($\frac{1}{4500}$) to the 13th power, or one over a number with approximately 40 zeroes, represented the chance that the 13 hairs had come from someone other than Featherstone. She argued that this proved Featherstone's guilt beyond reasonable doubt. Defense counsel did not object to this argument because, at that time: (1) the judge had already overruled several prior objections on the ground that the prosecutor's statements were argument, not evidence; (2) he could not recall *People v. Collins,* 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33 (1968), a California case disapproving of

---

**3.** The instruction read in pertinent part as follows:

"You have heard testimony that on one occasion prior to this trial Detective Jim Wegman of the Los Angeles Police Department displayed to Christine Emmons a photographic line-up from which Miss Emmons allegedly identified the eyes of the defendant.

"You have also heard testimony from Detective Wegman that following this identification he and other officers failed to preserve the line-up photographs from which Miss Emmons allegedly made her identification.

"You should consider such evidence with extreme caution. The failure of the police department to preserve such photographs greatly hampers the defense in cross-examining the officer and the witness in an attempt to determine whether the procedure was fair and whether or not the photographs used were similar enough so as not to cause the defendant to stand out, thereby suggesting to the witness that his photograph be identified.

"In addition, the failure to preserve such evidence prevents the jury from independently viewing the photographs to determine what weight, if any, such a prior identification should be given.

"While such an identification is inherently unfair to the defendant, you may still consider it for whatever weight you feel it is worthy. However, you are instructed that a photographic lineup procedure where the photographs remain available for the jury to see and scrutinize is an inherently more reliable means of identification."

the use of statistical probability evidence, and was therefore unsure whether the prosecutor's comments constituted reversible error. Defense counsel concluded that an objection probably would be overruled and only emphasize the comments.[4] Here, petitioner claims that this argument deprived him of due process of law.

Relief on this ground by way of federal habeas corpus is unavailable. Counsel did not object to these remarks at trial, and the California Court of Appeal specifically determined that objection to the argument was waived and consequently could not be raised on appeal. This determination stands as a procedural barrier to the defendant's ability to raise this essentially state-law issue in federal court. This long-standing rule was accurately stated in *Chavez v. Dickson*, 280 F.2d 727 (9th Cir. 1960), *cert. denied*, 364 U.S. 934, 81 S.Ct. 379, 5 L.Ed.2d 366 (1961): "[s]tate remedies will not be deemed to have been exhausted within the meaning of 28 U.S.C.A. § 2254 if the failure to obtain a final state adjudication was due to inexcusable nonconformity with state procedural requisites." 280 F.2d at 733 (footnote omitted). "When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court." *Ylst v. Nunnemaker*, — U.S. —, 111 S.Ct. 2590, 2593, 115 L.Ed.2d 706 (1991) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87–88, 97 S.Ct. 2497, 2506–2507, 53 L.Ed.2d 594 (1977) and *Murray v. Carrier*, 477 U.S. 478, 485–92, 106 S.Ct. 2639, 2643–47, 91 L.Ed.2d 397 (1986)). "[W]here ... the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits." *Id.* 111 S.Ct. at 2594. Thus, petitioner can only be relieved of this barrier if he can establish both "cause and prejudice" for the default, or if it appears that he is actually innocent.

*Murray v. Carrier*, 477 U.S. 478, 495–96, 106 S.Ct. 2639, 2649–50, 91 L.Ed.2d 397 (1986).

Petitioner maintains there was "cause" for his default, and that the "cause" was the error made by his attorney in failing to object to the prosecutor's improper argument. To decide this issue, we follow the guidance of the Supreme Court in *Murray v. Carrier:*

> [s]o long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in Strickland v. Washington, we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default.

*Id.* at 488, 106 S.Ct. at 2645. Because we decide in Section IX, *infra*, that petitioner's counsel's performance did not fall below the *Strickland* standard, we find no "cause" as required by *Murray v. Carrier*. Moreover, because the record reveals satisfactory independent evidence of identity as to the Emmons counts, and because the jury was told that counsel's arguments were not themselves evidence, we conclude that petitioner was not prejudiced by the prosecutor's improper remarks. Finally, it does not appear that petitioner is "actually innocent," and therefore entitled to an exception to the cause and prejudice requirement. Accordingly, the barrier to relief in federal court stands. *See id.* at 495–96, 106 S.Ct. at 2649–50.

## IX

We come then to petitioner's final claims, and not surprisingly they are that he was badly served by his attorneys to the extent that his Constitutional rights to effective counsel both at trial and on appeal were denied. To prevail on either prong of his argument, petitioner must demonstrate first that his counsel made professional errors, and second, that were it not for

---

**4.** Petitioner's counsel on appeal to the California Court of Appeal did not raise an issue of

ineffective trial counsel.

these errors it is reasonably possible that he would have received a more favorable result. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

■ Petitioner's trial counsel erred when he failed to object to the prosecutor's manifestly improper statistical argument. California law clearly disfavors such "evidence." However, we are satisfied that the mistake was not of such a magnitude that it is reasonably possible that had it not occurred, petitioner would have been acquitted. A substantial amount of other independent evidence pointed squarely at his guilt, and the jury was properly advised that counsel's statements were merely argument, not evidence. In all other respects, experienced trial counsel provided petitioner with vigorous and skillful representation.

■ With respect to petitioner's dissatisfaction with the performance of appellate counsel insofar as counsel did not attack the adequacy of trial counsel's performance, we are satisfied that appellate counsel's failure to do so did not constitute error. As discussed earlier, trial counsel's performance, although not error-free, did not fall below the *Strickland* standard. Thus, petitioner was not prejudiced by appellate counsel's decision not to raise issues that had no merit.[5]

AFFIRMED.

---

5. Petitioner also claims ineffective assistance of appellate counsel in failing to augment the record on appeal. He is mistaken. Counsel filed such a motion on May 14, 1985, and it was granted on May 28, 1985.